UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEAST DIVISION

STEPHANIE BAYLES,           )
    Plaintiff,           )
v.                          ) Case No.: 2:09-cv-0114
                            ) SENIOR JUDGE WISEMAN
                            ) MAGISTRATE JUDGE BROWN
MICHAEL J. ASTRUE,          )
Commissioner of Social Security, )
    Defendant.          )

To:    The Honorable Thomas A. Wiseman, Jr., Senior Judge

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income (SSI) as provided under Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 401–433, 1381–1383. The case is currently pending on plaintiff's motion for judgment on the administrative record. (Docket Entry No. 14). The Magistrate Judge has reviewed the administrative record. (Docket Entry No. 13) (hereinafter "Tr."). For the reasons stated below, the Magistrate Judge recommends that the Plaintiff's motion for judgment be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

## I. INTRODUCTION

Plaintiff protectively filed her application for SSI on January 28, 2008, with an alleged onset of disability of March 13, 1996. (Tr. 24). Plaintiff's claim was denied first on July 1, 2008, and again after reconsideration on November 20, 2008. (Tr. 24, 25). Plaintiff's request for a hearing before an administrative law judge ("ALJ") was granted and took place on March 26,

1

2009.  (Tr. 8-20).  The Plaintiff, represented by counsel John Wayne Allen, and a vocational

expert ("VE") testified at the hearing.  *Id.*  The ALJ's written decision, dated April 10, 2009,

denied Plaintiff's claim.  (Tr. 26).  The ALJ made the following findings of fact and conclusions

of law:

1. The claimant has not engaged in substantial gainful activity since January 28, 2008, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: degenerative disc disease, peripheral neuropathy, diabetes mellitus type II, and obesity ( 20 C.F.R. 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity ("RFC") to occasionally lift ten to thirty pounds, stand or walk for up to two to four hours, and sit for up to six to eight hours of an eight hour workday.  She should perform no more than frequent climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling and no more than occasional climbing ladders, ropes, or scaffolds.

5. The claimant is unable to perform any past relevant work (20 C.F.R. 416.965).

6. The claimant was born on June 1, 1961 and was 46 years old, which is defined as a "younger individual", on the date the application was filed (20 C.F.R. 416.963).

7. The claimant has a high school education and is able to communicate in English (20 C.F.R. 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 C.F.R. 416.969, and 416.969(a).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 28, 2008, the date the application was filed.  (20 C.F.R. 416.920(g)).

2

(Tr. 30-35).

Plaintiff requested review of the ALJ hearing and decision by the Appeals Council
("AC") on April 22, 2009. (Tr. 6). Subsequently on October 6, 2009, the AC denied the request
stating they found no reason to review the ALJ's decision, rendering the ALJ's decision as the
final decision of the Commissioner of Social Security in this case. (Tr. 1). The Plaintiff timely
filed this civil action, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings
are supported by substantial evidence, based on the record as a whole, then these findings are
conclusive. *Id.*

## II.  REVIEW OF THE RECORD

The Plaintiff was a 47-year-old woman at the time of the ALJ's decision with a benefit
application date of January 28, 2008. (Tr. 11, 26). She completed truck driving school in 1982
and reported to an occupational rehabilitation specialist that she obtained an Associates Degree
in business administration in 1985. (Tr. 104, 230). Contrarily, she reported to the ALJ that she
does not have a degree, but completed two to three years of college. (Tr. 11, 104). The
Plaintiff's past relevant work includes "tractor trailer truck driver." (Tr. 18).

A.  Testimonial Evidence

The Plaintiff alleged in her initial application for benefits that the following problems
limited her ability to work: a broken back, fibromyalgia, degenerative disc disease, and shoulder
problems. (Tr. 99). She reported that she broke her back in 1985 while she was working as a
truck driver. (Tr. 187). The Plaintiff was in the sleeper compartment of the truck when the
second driver had an accident that caused the truck to roll over injuring her back, shoulder, and
hip primarily. *Id.* In testimony before the ALJ, the Plaintiff attributed pain in her right shoulder

3

and neck to "nerve damage" she sustained in the 1985 accident, which she stated seemed to be "getting worse because my arm just hurts all the time." (Tr. 13). She reports that she recovered from the back injuries sustained in the 1985 accident, but she re-injured herself in 1996 when, while on-the-job as a truck driver, she hit another truck in the rear end. *Id.* She alleges that she has suffered back pain since the 1996 incident and has been unable to work. (Tr. 12, 187). The Plaintiff in both her initial application and in testimony before the ALJ complained of numbness in her hands and feet that she also attributes to the "nerve damage" she sustained in the 1985 accident. (Tr. 12, 99). While the Plaintiff reports that the pain in her neck, shoulders, hands and feet has worsened, she consistently reports that she uses only over-the-counter medication, namely ibuprofen, to manage her pain. (Tr. 103, 120, 122, 133, 154, 199).

Regarding the Plaintiff's day-to-day life, the record reflects very little information and suggests relatively unstable living arrangements. On her initial application, the Plaintiff reported that she was living with friends but expected her living arrangements to change as she would be applying for government housing (Tr. 89). She reported that she was divorced since January 1984, and had two daughters who were in the State's custody. On a pain questionnaire completed by the Plaintiff on May 29, 2008, she stated that her "fiancé" helps her with household chores, possibly indicating a different living situation. (Tr. 123). The Plaintiff was not asked about her living arrangements during the ALJ hearing and did not indicate that anyone helps her with daily tasks or transportation.

The Plaintiff wrote on her pain questionnaire that she is limited in her daily activities in the following ways: able to walk only limited distances, uses motorized cart to shop, takes many breaks to rest while doing household chores such as washing dishes and cooking, and cannot feel

4

her feet. (Tr. 121). At the ALJ hearing, the Plaintiff testified that on a typical day she gets up and cooks breakfast if her "body's cooperating" and cleans some. (Tr. 13). She elaborated by stating that she can usually perform typical household work such as sweeping, mopping, cooking or washing dishes in increments of approximately five minutes with thirty minute rest breaks between tasks. (Tr. 13-14). When the ALJ asked about the Plaintiff's ability to tolerate sitting for a length of time, she reported that she sits in a recliner, but has to change positions after about twenty to thirty minutes. (Tr. 14). Regarding standing and walking, the Plaintiff testified that she cannot stand still without being in significant pain and that she may be able to persist at walking for a block and a half. *Id.*

The Plaintiff's functional abilities related to the numbness and/or pain in her hands and feet were addressed in the pain questionnaire and at the ALJ hearing. She said that she cannot feel her feet, but has compensated in a way that she is still able to drive a car. (Tr. 16). She also said she has difficulty gripping items, which did not impact her ability to hang on to light items, such as a pencil, but experienced pain with heavier items. (Tr. 16-17). She testified that she feels a "thunderbolt" type of pain when she picks up or grips heavy items like a gallon of milk. *Id.* She also stated that pain causes her to shake and, therefore, she is concerned to hold a hot pot while cooking. (Tr. 14). The Plaintiff's testimony regarding her grip is consistent with her pain questionnaire where she wrote that her "grip grows weaker with pain." (Tr. 122).

B. Medical Evidence

The Plaintiff's medical records show various time periods of treatment including long periods of no treatment and reveals many types of complaints and motivations for seeking medical assistance. The earliest medical record in the file is from Dr. David St. Clair, an

5

orthopaedic surgeon, dated April 26, 2001. (Tr. 187). The Plaintiff complained of back, shoulder, neck, and hip pain. (Tr. 188). The doctor noted that she had no chronic medical problems except multiple pain complaints since 1985. *Id.* He also reported that she had a "heel toe" gait, negative Trendelenberg test, and could stand on both heels and toes. The Plaintiff was able to bend forward with net lumbar flexion of 45 degrees. *Id.* The doctor noted that there were "no skin changes of peripheral vascular disease." (Tr. 191). Dr. St. Clair diagnosed the Plaintiff with fibromyalgia due to typical symptoms of sleep disturbance and trigger points, ordered lab work to rule out rheumatoid arthritis and diabetes, and prescribed the drugs elavil and flexoril.[1] *Id.* Dr. St. Clair evaluated the Plaintiff again on May 11, 2001, noting that she was sleeping better and having less pain after taking elavil. (Tr. 186). On June 8, 2001, the Plaintiff visited Dr. St. Clair to get progress notes to take to a vocational rehabilitation program and also requested stronger pain medication for times when her pain was worse. (Tr. 185). The doctor prescribed non-narcotic Ultram. *Id.* After this June 2001 visit, the record includes no medical treatment until March of 2003.

Dr. St. Clair saw the Plaintiff due to complaints of left arm pain on March 28, 2003. (Tr. 181). At that time, he noted that her medications included Lexapro, Zocor, and Celebrex. After examining her ambulation, he reported that the Plaintiff had "heel toe" gait, a normal walking rate, negative Trendelenberg test, and could stand on both heels and toes. *Id.* Dr. St. Clair

---

[1] Elavil is a drug used primarily used to treat depression, but is sometimes prescribed to treat certain types of pain and trouble sleeping. Flexeril is a muscle relaxer used to decrease pain and muscle spasms. www. RxList.com, search for each drug by name and reviewing consumer information. Last visited, June 18, 2010.

diagnosed the Plaintiff with lateral epicondylitis, prescribed cogesic,[2] ordered lab work to check for diabetes, and requested that she follow up in two weeks. *Id.* The last medical report from Dr. St. Clair in the record is from a visit on April 11, 2003 to follow up from the previous visit. (Tr. 180). He noted that the Plaintiff did not yet have the lab work he ordered, that her lateral epicondyle was not tender, and advised her to return if her symptoms recurred. *Id.* The records indicate no further medical visits following this April 2003 visit until January of 2006.

From January 2006 through March 2008, the record reflects that the Plaintiff was seen several times at the Putnam County Health Department ("PCHD"), primarily for treatment of diabetes.[3] The first treatment notes in the record reflect that the Plaintiff was seen on January 30, 2006 requesting assistance for diabetes management. (Tr. 169). The Plaintiff stated that she had been diagnosed and treated for diabetes while in jail in 2004 and since then been taking her husband's insulin. *Id.* The doctor diagnosed her with diabetes mellitus and high blood pressure and also noted that she had a history of the following: abnormal pap, fibromyalgia, and multiple injuries from a motor vehicle accident (Tr. 170). She was prescribed glyburide for diabetes and lisinopril for high blood pressure. *Id.* Next, she was seen at PCHD on July 21, 2006 at which time the notes indicate that the Plaintiff had been released from jail for two days needed medication refills (Tr. 167). She was prescribed the same drugs as on the previous visit along with ibuprofen and metformin (another diabetes medication). She was assessed as a diabetic with high blood pressure and advised to stop smoking, lose weight, follow a diabetic diet, and

---

[2] This drug is indicated for relief of moderate pain. www.drugs.com/pro/co-gesic.html.

[3] All notes from Putnam County Health Department are hand-written, therefore, names and titles of the treatment providers are generally illegible.

schedule a women's health physical.[4]  *Id.*  The Plaintiff was seen on October 9, 2006 for

medication refills for diabetes and high blood pressure.  (Tr. 165).  She reported that she had

been without her medication for one week prior to this appointment.  *Id.*  In addition to the prior

prescribed medications, the Plaintiff was prescribed lovastatin for high cholesterol.  *Id.*  She was

also counseled by the doctor to lose weight, increase activity, and stop smoking.  She was also

instructed to never completely run out of medication before coming to the clinic and to follow up

properly.  *Id.*  The Plaintiff was again seen at the PCHD in April and October of 2007, both

times having just gotten out of jail and needing refills on the medications listed above.  (Tr. 161,

163).  During the October 2007 visit, the Plaintiff was advised again to stop smoking and lose

weight and further advised that she needed to take more responsibility for her health.[5]  (Tr. 161).

On March 28, 2008, the Plaintiff visited the PCHD for refills on her medications.  Her blood

sugar was 304, and she admitted that she had not been checking it daily.  (Tr. 153).  The Plaintiff

was assessed as having the following conditions: diabetes mellitus, high blood pressure,

hyperlipidemia, obesity, tobacco use, chronic back pain, heart palpitations, and ASCUS pap.  *Id.*

She was prescribed refills for the medications previously mentioned, and advised to follow up

regarding the ASCUS pap in July of 2008. *Id.*

Medical notes dated January 30, 2008 document that a phone call was made to the

---

[4] The Plaintiff was seen again in July 2006 regarding the lump in her right arm, which was diagnosed as a possible sebaceous cyst or fibrosis.  (Tr. 168).  She was scheduled to have it removed on July 31, 2006 but did not show up for her appointment.  *Id.*

[5] Between January 2006 and January 2008, the Plaintiff's blood sugar was consistently well above the reference range listed on lab reports of 65-99.  (Tr. 171).  In a total of eight visits during that time, her blood sugar ranged from 178-307 with an average of 249.  (Tr. 153-179).

Plaintiff to notify her that her pap test result showed "ASCUS,"[6] and she was advised to follow up in six months. (Tr. 155). This was the first indication in the records provided of any abnormality of the Plaintiff's cervix. Skipping ahead in time to discuss this particular medical condition, on February 10, 2009, Dr. Michael Pippin diagnosed the Plaintiff with carcinoma in situ of the cervix and recommended a conization of the cervix.[7] (Tr. 233). Dr. Pippin performed the conization on February 19, 2009 and reported after her post-operative examination that the Plaintiff's endocervical margin was free from dysplasia and suggested another pap test in 60 days. (Tr. 232).

Between April and July of 2008, the Plaintiff was physically evaluated once by a doctor from a vocational rehabilitation program and another time by a consultative examiner for the Plaintiff's disability determination. In addition, her records were reviewed by a non-treating physician for his recommendation on her functional capacity. Subsequent to the Plaintiff's application for Social Security Disability, she applied for acceptance to a vocational rehabilitation program and was physically evaluated by Dr. James Talmage on April 23, 2008. (Tr. 229). Dr. Talmage observed that she was able to reach the floor by bending forward or partially squatting. *Id.* She displayed no limitation in ability to move the joints in her upper and lower limbs. *Id.* Dr. Talmage reported that the Plaintiff exhibited grip strength of 53 pounds on the right and 50 pounds on the left. She was unable to do the heel-to-toe tandem gait and had

---

[6] ASCUS stands for atypical cells of undetermined significance. This would generally cause a practitioner to monitor for future cervical changes. www. gynalternatives.com/cervical.htm (last visited June 18, 2010).

[7] Carcinoma in situ is classified as "stage 0" cancer. The abnormal cells may or may not be malignant and are confined to the surface lining of the cervix. The five-year survival rate is 100 percent. http://womenscancercenter.com/info/types/cervix.html (last visited June 18, 2010).

significant increase in "trunk sway" on the Rhomberg test. *Id.* The Plaintiff described that she was able to stand for 30 minutes at a time for up to 4 hours during the workday and unlimited in her ability to tolerate sitting. She stated that she was motivated to get a job in order to attempt to regain custody of her daughters ages nine and eleven. (Tr. 230). Dr. Talmage diagnosed the Plaintiff with persistent back pain due to a past compression fracture of the T5 vertebrae, a subluxable right shoulder, fibromyalgia "by history," diabetes mellitus with evidence of significant peripheral neuropathy, high blood pressure, and morbid obesity. *Id.* He also noted that the only pain medication used by the Plaintiff was ibuprofen. *Id.* In light of Dr. Talmage's physical exam, the Plaintiff was approved for the vocational rehabilitation program with the physical limitation that she could not stand or walk for more than 3 hours, she was no longer able to drive tractor trailers, and that she be drug tested periodically due to the fact that she has a 30 year history of cocaine abuse. (Tr. 226). Two months after approval for the vocational rehabilitation program, the Plaintiff was medically evaluated for disability determination.

On June 11, 2008, Dr. Jerry Lee Surber in his capacity as a consultative physical examiner for social security disability determination saw the Plaintiff. (Tr. 198). He noted that she had full and unlimited mobility in both shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers, including thumbs. (Tr. 200). She was able to touch her thumbs to each of her other fingers, and the doctor noted no areas of decreased sensation to light touch involving her hands or feet. *Id.* Dr. Surber reported that the Plaintiff was able to "do a squat and stand maneuver about one-half of the way down complaining of right greater than left lower back pain and tightness in her hips and knees. (Tr. 201). Regarding her ability to walk, Dr. Surber found that the Plaintiff was able to perform straightaway, tandem, and heel-to-toe walks, and used no

assistive device. *Id.* Based on his exam, the doctor assessed that the Plaintiff could lift or carry 10-30 pounds occasionally, stand or walk for 2-4 hours in an 8-hour workday, sit with normal breaks for 6-8 hours of a normal workday. (Tr. 202).

After review of the all examination reports and other medical evidence in the record, Dr. Lloyd Walwyn in his capacity as a non-examining physician for the Social Security Administration assessed the Plainiff's RFC on July 1, 2008. (Tr. 210). He found the Plaintiff's subjective pain to be partially credible based on the fact that the plaintiff had no surgeries or physical therapy to alleviate her symptoms and only took over-the-counter pain medication to control the pain. *Id.* Dr. Walwyn assessed that the Plaintiff was able to lift 50 pounds occasionally and 25 pounds frequently. (Tr. 204). He estimated that she could stand or walk for about 6 hours in an 8-hour workday and sit for approximately 6 hours. *Id.* Dr. Walwyn noted that the Plaintiff was unlimited for pushing and pulling and could frequently climb stairs, stoop, kneel, crouch, or crawl. (Tr. 205).

The only other medical evidence present in the record that occurred prior to the ALJ hearing involves four visits to a nurse practitioner between February 12, 2009 and March 12, 2009. (Tr. 221-224). At the first visit, the nurse noted that the Plaintiff had full range of motion, assessed her as having diabetes and high blood pressure, and continued the medications previously prescribed. (Tr. 221). At the third visit on March 4, 2009, the nurse noted that the patient was having pain in her neck, left arm, and left shoulder as well as numbness in some fingers and in her feet. (Tr. 223). At the same time, the nurse marked that the Plaintiff has a steady gait, full range of motion, and strength 5/5. *Id.* The nurse prescribed additional anti-inflammatory medications to aid with the Plaintiff's back pain and noted that she would like to

11

start the Plaintiff on the drug "Neurontin" for neuropathy in her feet at a future date. *Id.* Eight days later on March 12, 2009, the nurse saw the Plaintiff again noting that the Plaintiff asked her to complete disability evaluation papers. (Tr. 224). At this visit, the nurse added several new diagnosis that were not listed at the previous visit (fibromyalgia, obesity, depression, and cervical CA). *Id.* She also noted that the patient now had a slight limping gait. *Id.* On a form to assess RFC, the nurse marked that she expected the Plaintiff's impairments to last at least twelve months and limited her functionality as follows: frequent interference to attention and concentration due to pain; capable of low stress jobs; able to walk 1.5 blocks, sit 30 minutes, or stand 10 minutes; able to sit for 2 hours and stand/walk for 2 hours in an eight-hour workday; able to walk around every 30 minutes for 5-10 minutes each time; able to take 15-30 minute unscheduled breaks as needed; able to elevate legs 6-12" 100% of the time; lift less than 10 pounds occasionally; never twist, stoop, crouch, and climb ladders; rarely climb stairs; no grasping, turning or twisting of objects or overhead reaching; and fine manipulations of the fingers only 1-2% of the time. (Tr. 217-18).

After the ALJ issued his decision on April 10, 2009, the Plaintiff was admitted to Cookeville Regional Medical Center on July 28, 2009 upon referral from Baxter Medical Clinic due to gangrene in both of her great toes. (Tr. 255). The record indicates that the Plaintiff "stubbed her toes bilaterally several months ago" and that she initially hurt her toes when tight shoes caused abrasions on her feet. (Tr. 259). She had not sought medical treatment before this date when the "smell, appearance, and tenderness" of her feet prompted her to go to the medical clinic. *Id.* The treating physician at the hospital noted that the Plaintiff had slightly decreased sensation in both feet but did not list peripheral neuropathy in his assessment of her condition.

(Tr. 261). At the Plaintiff's request, conservative debridement of the infected areas was performed in order to avoid amputation of the toes. (Tr. 270). However, amputation of both great toes was eventually necessary on July 31, 2009 due to the extensive nature of the infection. Further debridement of the wounds was performed on August 3, 2009, and the Plaintiff was discharged with home health care and many prescription medications including intravenous antibiotics. (Tr. 257). Due to "medical non compliance," the Plaintiff was re-admitted to Cookeville Regional Medical Center on August 14, 2009 with "foul-smelling wounds and dressings, which had not been changed for days." (Tr. 249). The wounds were surgically debrided again on August 18, 2009, and the medical evidence in the record ends with the notes from that procedure. *Id.*

### III. CONCLUSIONS OF LAW

#### A. Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exits in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986). "Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner*, 105 F.3d 244, 245 (6th Cir. 1996). Even if the evidence could also support a difference conclusion,

Case 2:09-cv-00114   Document 21   Filed 07/13/10   Page 13 of 23 PageID #: 98

the decision of the ALJ must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). However, if the record was not considered as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985).

B. <u>Proceedings at the Administrative Level</u>

The Claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A). At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)     If the claimant is working and the work constitutes substantial gain activity, benefits are automatically denied.

(2)     If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)     If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[8] or its equivalent; if a listing is met or equaled, benefits are owing without further inquiry.

(4)     If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (*e.g.*, what the claimant can still do despite his or her limitations); by showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

_____

[8]The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, Appendix 1.

14

(5)    Once the claimant establishes a *prima facie* case of disability, it becomes the Commissioner's burden to establish the claimant's ability to work by providing the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

*Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the valuation process can be carried by relying on the medical vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination. *Id.* In such cases where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert (VE) testimony. *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity (RFC) for purposes of the analysis required at steps four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. § 423 (d)(2)(B).

C.  <u>Plaintiff's Statement of Errors</u>

Plaintiff alleges four errors in the ALJ's decision: (1) the ALJ did not consider whether the Plaintiff suffers from the listed impairment of Peripheral Neuropathy (listed impairment

15

11.14); (2) the ALJ did not properly consider the Plaintiff's obesity as required by Social Security Ruling 02-01p; (3) the ALJ did not properly consider the Plaintiff's fibromyalgia; and (4) the Plaintiff is entitled to a remand pursuant to Sentence Six, 42 U.S.C. § 405(g) for consideration of new evidence.[9]

### I. The ALJ's evaluation of Plaintiff meeting or equaling a listed impairment

The ALJ properly determined at Step Three of the sequential evaluation process that the Plaintiff did not meet or medically equal the criteria for "peripheral neuropathies" as listed at 11.04 of 20 C.F.R. 404, subpart P, appendix 1. The Plaintiff claims that Dr. Talmage's evaluation of her sensation and Nurse Thompson's report, together with evidence that she eventually had both great toes amputated provide the basis for the finding that she meets the requirements for Listing 11.04. However, the Plaintiff's reasoning is incorrect for two reasons. First, the ALJ had no evidence to consider regarding the amputation since that procedure occurred a few months after the hearing. (Tr. 254). The issue of the amputation as "new evidence" will be considered in a discussion of Plaintiff's forth alleged error below. Second, there is not enough evidence to say that the Plaintiff has a medically determinable impairment that satisfies *all* of the criteria of the listing. 20 C.F.R. 416.925(d)(italics added). A claimant cannot meet the requirements with the diagnosis alone. *Id.* To meet the listed impairment of

---

[9] The Magistrate Judge strongly cautions Plaintiff's counsel regarding the overuse of various typeface conventions in the Memorandum in Support of Motion for Judgment on the Administrative Record (Docket Entry No. 15). The excessive use of bold, italics, and all capital letters is extremely distracting for the reader. Consult THE BLUEBOOK: A UNIFORM SYSTEM OF CITATION (Columbia Law Review Ass'n et al. eds., 18th ed. 2005) for further guidance on accepted typeface conventions in legal writing. The Magistrate Judge also notes that the Commissioner's brief exceeds the 25-page limit of Local Rule 7.01(e)(1) by 14 pages. If more pages are needed to summarize the administrative record or otherwise respond, Court permission must be sought first.

16

peripheral neuropathy, a claimant must have disorganization of motor function despite treatment of the condition.  *Id.*  Disorganized motor function means that the claimant's functionality must be significantly and persistently disorganized in two extremities such that there is sustained disturbance of gait or station.  20 C.F.R. 404, subpart P, Appendix 1, § 11.04(B).  Furthermore, impairment assessment for peripheral neuropathy depends on the extent to which the claimant's ability to move from place to place is affected.  20 C.F.R. 404, subpart P, appendix 1, § 11.00(C). Here, the Plaintiff's functionality is not significantly and persistently disorganized because her medical records do not indicate that she suffers sustained disturbance of gait or station.

The Magistrate Judge recognizes that the ALJ did not adequately support his finding that the Plaintiff did not meet or equal a listed impairment. However, the ALJ's conclusion is supported by substantial evidence in the record.  While Dr. Talmage acknowledged decreased sensation in the Plaintiff's feet, he noted that she did not fall on the Rhomberg test.  (Tr. 229). During that examination, the Plaintiff described that she could tolerate standing for up to 4 hours in a workday separated by breaks.  (Tr. 230).  Dr. Talmage's testing and the Plaintiff's statements indicate that her feet were not significantly or persistently disorganized and that she was still able to ambulate without assistance.  Two months later, Dr. Surber noted that the Plaintiff was able to perform straightaway, tandem, and heel-to-toe walks, had a waddling side-to-side gait, and used no assistive device.  On March 4, 2009, Nurse Thompson noted that the Plaintiff complained of numbness in her feet, but marked that she had steady gait.  (Tr. 223).  On March 12, 2009, Nurse Thompson examined the Plaintiff and noted that she displayed a slight limping gait. (Tr.  224).  However, there is no indication that the change in the Plaintiff's gait

17

between the March 4th and March 12th visits was permanent. The above listed evidence suggests that the Plaintiff's lower extremities were not significantly and persistently disorganized such that there was sustained disturbance of gait or station.[10] This substantially supports the ALJ's conclusion that the Plaintiff did not meet or equal a listed impairment.

### II.  The ALJ's consideration of Plaintiff's obesity

The ALJ properly considered the Plaintiff's obesity throughout the sequential evaluation process. The Plaintiff claims that the ALJ did not comply with Social Security Ruling 02-01p ("SSR 02-01p"), which instructs adjudicators to consider the effects of obesity at each step of the evaluation process including during assessment of a Plaintiff's residual functional capacity ("RFC"). S.S.R. 02-01p at *1. The Magistrate Judge believes that the Plaintiff's argument is weak because it cites large portions of S.S.R. but fails to point to evidence in the record to support the idea that her obesity increased the severity or functional limitations of her other conditions. SSR 02-01p describes obesity as a risk factor that can lead to or complicate other conditions such as diabetes mellitus, high blood pressure, and hyperlipidemia. *Id.* at *3. At step two, obesity itself can be listed as a severe impairment when "it significantly limits an individual's . . . ability to do basic work activities. *Id.* Obesity may be a factor in determining whether a claimant meets or equals a listed impairment in step three. *Id.* However, SSR 02-01p specifically states that "we will not make assumptions about the severity or functional effects of obesity combined with other impairments. . . . We will evaluate each case based on the information in the case record. *Id.* at *6. In other words, the ALJ must support findings related

_____

[10] This is true regardless of the weight the ALJ afforded to Nurse Thompson's assessment of the Plaintiff's peripheral neuropathy, because the nurse's notes do not show significant or persistent disorganization of motor function.

18

to obesity as a factor at any step of the sequential evaluation process with substantial evidence taken from the record. Last, the ALJ should explain how he reached a decision on whether obesity caused a functional limitation. *Id.* In the present case, the Magistrate Judge recognizes that ALJ did not specifically state a conclusion regarding the effects of the Plaintiff's obesity, nor did he expressly consider it at each step of the sequential evaluation process. However, his omission does not mean that he did not comply with SSR 02-01p.

None of the medical evidence in this Plaintiff's record points directly to obesity as the cause of or a factor in the Plaintiff's functional limitations. The ALJ listed obesity as one of the Plaintiff's severe impairments at Step Two of the sequential evaluation process, which is supported as a diagnosis by substantial evidence in the record. (Tr. 30, 153, 156, 165, 190, 201, 203, 230). However, the symptoms that limit this Plaintiff's functionality such as pain and numbness are not attributed to obesity in the medical records. In most instances, the Plaintiff's back, neck, and shoulder pain are attributed to injuries the Plaintiff sustained in the 1985 and 1996 trucking accidents. (Tr. 187, 198, 228). The Plaintiff also attributes the numbness in her hands and feet to "nerve damage" sustained in those accidents. (Tr. 12, 99). On the other hand, Dr. Talmage indicates that the Plaintiff suffers from peripheral neuropathy as a result of her diabetic condition. (Tr. 230). In accord with SSR 02-01p, the ALJ here did not assume that the effects of obesity caused or aggravated peripheral neuropathy or any of the Plaintiff's other conditions because substantial supporting evidence of such was absent from the record.

### III. The ALJ's consideration of Plaintiff's fibromyalgia

The Magistrate Judge believes that, despite the Plaintiff's claim to the contrary, the ALJ properly considered fibromyalgia in his disability determination. At Step Two, the ALJ stated

that there was no medical evidence in the record demonstrating functional limitations caused by fibromyalgia. To qualify as a "disability" under the Act, the impairment must be medically determinable and has or is expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A). Dr. St. Clair diagnosed the Plaintiff with fibromyalgia in 2001 and prescribed medications specific to treat that condition. (Tr. 187). At a follow-up appointment approximately one month following the diagnosis and corresponding medication, Dr. St. Clair noted that the Plaintiff was sleeping better and experiencing less pain. (Tr. 186). The last medical record on file from Dr. St. Clair is from 2003. (Tr. 180). Since that time, there is no evidence that substantially supports that the Plaintiff was or is disabled by fibromyalgia within the meaning of the law. Out of at least ten visits to the Putnam County Health Department from January 2006 through March of 2008, only the January 30, 2006 report lists fibromyalgia as a condition the Plaintiff reported. (Tr. 170). No medication was prescribed related to fibromyalgia at that visit or any other later visit in the record. *Id.* Dr. Talmage and Dr. Surber thoroughly examined the Plaintiff in mid-2008 and both reported that the patient claimed to have fibromyalgia but that she only used ibuprofen to treat pain. (Tr. 202, 229). Nurse Thompson, whose opinion was properly given no weight by the ALJ[11], saw the Plaintiff four times between

---

[11] Acceptable medical sources for establishing medically determinable impairments are licensed physicians, psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. § 416.913(a). Evidence from other sources such as nurse practitioners may be used to show the severity of an impairment, but cannot be used to establish the existence of an impairment. 20 C.F.R. § 416.913(d); S.S.R. 06-03p. Factors to consider when evaluating the opinion of "other" sources include the following: the treatment relationship including length, nature, and frequency of examination; the degree to which an acceptable medical source explains the same impairment; and the consistency of the "other" source with the record as a whole. S.S.R. 06-03p. Here, Nurse Thompson had a relatively short relationship with the patient and many aspects of her opinions contradict the record as a whole.

February 12, 2009 and March 12, 2009 but only documented fibromyalgia at the last appointment after the Plaintiff requested that the Nurse fill out disability papers for her. (Tr. 221-225). These facts do not establish a medically determinable impairment that has lasted or is expected to last for not less than twelve months, therefore, the ALJ properly concluded that there was not enough medical evidence in the record to support fibromyalgia as a severe condition for this Plaintiff.

### IV. The Plaintiff's entitlement to remand due to new evidence

The Magistrate Judge does not believe that the Plaintiff has put forth new and material evidence that would entitle her to a remand pursuant to sentence six of 42 U.S.C. § 405(g). The Plaintiff asserts that medical evidence from July and August of 2009 regarding amputation of her right and left great toes is related to her condition during the administrative proceedings and would likely have changed the ALJ's decision. As stated in the sixth sentence of 42 U.S.C. § 405(g), the court may remand a disability case for hearing of additional evidence, but only if the evidence is new and material and there is good cause for the failure to present the evidence in a prior proceeding. Evidence is considered "material" if there is "a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary of H.H.S.*, 865 F.2d 709, 711-712 (1988). This action is only appropriate if the evidence relates to the claimant's condition during the administrative proceedings. *Id.* However, it is not appropriate for the court to remand based on evidence that a claimant's condition deteriorated after the administrative proceedings. *Id.*

As the record indicates, the Plaintiff sought medical treatment on July 28, 2009 for gangrenous infections in her feet. (Tr. 260-261). The Magistrate Judge agrees that the evidence

21

is new and that there is good cause for the failure of the Plaintiff to present the information in earlier administrative proceedings, but he does not believe that remand is appropriate because the evidence does not relate to the Plaintiff's condition at the time of the prior proceedings. The condition that led to the amputation of the Plaintiff's great toes originated with abrasions to the feet for which the Plaintiff waited months before seeking medical attention. (Tr. 259). There is no indication in the record that these abrasions existed during the time of the administrative proceedings. The only condition that existed during the administrative process related to the Plaintiff's feet was peripheral neuropathy. (Tr. 30). However, the treating physician at Cookeville Regional Medical Center noted that the Plaintiff only had slightly decreased sensation in her feet, and his assessment of the patient did not reflect a finding of peripheral neuropathy. (Tr. 261). Because the gangrene and subsequent amputations originated with a condition that did not exist during the administrative proceedings, remand under sentence six of 42 U.S.C. § 405(g) is not appropriate. Instead, if the Plaintiff has evidence that her health and functionality has further deteriorated, the proper course of action is to file a new claim. *Sizemore*, 865 F.2d at 712 (citing *Oliver*, 804 F.2d at 966 and *Ward*, 686 F.2d at 786 & n. 4).

## IV. RECOMMENDATION

In light of the foregoing, the Magistrate Judge recommends that Plaintiff's Motion for Judgment on the Administrative Record be **DENIED**, and that the decision of the Commissioner be **AFFIRMED**.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objection to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any

22

responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *Thomas v. Arn*, 474 U.S. 140 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004 (en banc)).

ENTERED this 13th day of July, 2010.

/S/ Joe B. Brown

JOE B. BROWN
United States Magistrate Judge